Filed 11/24/15  P. v. Alhimidi CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D066515 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE325289) |
| KASSIM ALHIMIDI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, William J. McGrath, Judge.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Kassim Alhimidi (Kassim) guilty of the first degree premeditated murder of his wife, Shaima Alhimidi (Shaima). The court sentenced Kassim to 25-years-to-life, plus one year for a deadly-weapon enhancement finding. Kassim appeals, asserting evidentiary and instructional errors. These contentions are without merit and we affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

Shaima was brutally attacked at home while sitting in front of her computer. At trial, it was undisputed the attack was intentional and premeditated. The primary question for the jury's determination was whether the prosecution proved Kassim was the person who committed this crime. There were no eyewitnesses, fingerprint evidence, or DNA evidence. But the prosecution presented evidence placing Kassim in the area of the home at the time of the attack and showing he had the motive and opportunity to kill his wife. Kassim's primary defense theory was that other individuals—particularly his teenage daughter and/or her boyfriend—were the more likely perpetrators. The trial was lengthy and numerous witnesses testified. However, as there is no sufficiency of the evidence challenge, we omit certain evidentiary details and discuss only the facts necessary to resolve the appellate contentions before us.

### *Summary of Crime*

Kassim and Shaima were from Iraq. They married while living in a refugee camp in Saudi Arabia; Shaima was about 13 or 14 years old, and Kassim was about 29 years old. Their first child, Fatima, was born in the refugee camp. When Fatima was about six

months old, the family moved to the United States, and the parents then had four additional children.

At the time of the crime, Shaima was 32 years old; Fatima was 17 years old; and the four younger children were teens and preteens. The family was living in a rented two-story, five-bedroom house on Skyview Street in El Cajon. Fatima's bedroom was above the garage in front of the house; the kitchen and the parents' bedroom were downstairs. Shaima did not work outside the home. Kassim had no regular job but he sold dates out of his home.

On the morning of the crime (March 21, 2012), Fatima stayed home from school because she was not feeling well and was "lazy" about going to school. As was her typical routine, for the next several hours Fatima stayed in bed with her door closed, alternately sleeping and texting and talking on her cell phone. At some point, she heard an argument downstairs, but believed it might be a telephone conversation because she thought only her mother was home. At about 10:45 a.m., Fatima heard noises downstairs, which she described as a squeal or a moan. She testified she thought maybe her mother burned herself in the kitchen. A few minutes later, she heard glass breaking, sounding like a plate falling to the floor. For a few additional minutes, she continued "on and off sleeping" and using her phone.

Fatima then went downstairs and saw her mother face down on the floor next to the family computer in the kitchen area. Shaima was entangled with the computer chair. Fatima immediately called 911 and said her mother had fallen. The 911 call was played for the jury, and showed Fatima to be confused and extremely upset. While on the

3

phone, Fatima noticed the amount of blood and then saw the back sliding glass door was shattered, making it seem that a stranger had broken into the house and attacked her mother. Later scientific analysis determined the glass door had likely been broken from the inside and was not the means of entry or exit.

Paramedics found Shaima unconscious; her hair and the nearby carpet were saturated with her blood. The spatter showed she had been hit while she was on the ground. One of the paramedics noticed a folded piece of paper on the floor about 10 feet from Shaima. The note stated: "This is my country go back to yours terrorist."

The family had received a very similar (if not identical) anonymous note left outside their house about one week earlier. The only difference between the two notes was that the earlier note was written in blue ink. Experts determined the note left near Shaima's body was a photocopy of an original note. Although Fatima thought the family had saved the note in a kitchen drawer, a search failed to uncover this original note. The handwriting on the photocopied note did not match the handwriting of Fatima or Kassim, and no DNA or fingerprints were found on the note.

Later investigation determined Shaima was attacked when she was logging into her Yahoo account on the computer at 10:41 a.m. Investigators also found a partially eaten plum on the floor next to Shaima with Shaima's DNA.

Shaima died three days later from blunt force trauma to her head. Shaima had at least six blunt force impacts to her head. She had four fractures on the base of her skull, a fracture of the right orbital plate that ran from her forehead all the way to the center of her skull, and fractures near both ears. Her face and arms were bruised. Her head

4

injuries suggest she was hit by a heavy object with a straight edge with enough force to crush and lacerate the scalp. No such weapon was ever found.

*The Investigation*

Police pursued many avenues of investigation. For example, they initially suspected a hate crime, and involved federal law enforcement authorities, but it was later decided that this theory was unsupported by the evidence. Police officers also considered 17-year-old Fatima and/or her boyfriend (Rawnaq Yacub) potential suspects, particularly because Fatima was home at the time of the attack and had a highly contentious relationship with her mother. However, as explained below, the police ultimately focused on Kassim as the likely killer.

*Kassim*

When Kassim was initially interviewed, he said that the morning of the crime, he drove his four younger children to their schools at about 7:30 a.m. and his oldest daughter (Fatima) stayed home. He drove his red Nissan Quest van (with a missing hubcap) that day. On his way back, Shaima called Kassim on his cell phone and asked him to buy bread, which he did. A video from the grocery store showed Kassim wearing a striped shirt and sweatpants with a stripe down the side. (Kassim was wearing different clothes later that day; the sweat pants with the stripe were never found in the Alhimidi home). Kassim returned home shortly after about 8:00 a.m., watched television, and took his kidney medications. He then went for a drive because his medicine made him nervous. He said he left the house about 9:30 or 9:40 a.m., and drove around the El Cajon/La Mesa area without stopping for about 90 minutes. He said he was still driving when Fatima

5

called him at about 11:17 a.m. to tell him about Shaima's injuries from the attack. He said he loved his wife and their relationship was fine. Kassim was distraught at the hospital. But two of his relatives also heard him saying: " 'What if she wakes up . . . and has memory loss and says it was me that hit her?' "

Police interviewed the Alhimidis' next-door-neighbor, Alvin Luckenbach, shortly after the attack. Luckenbach told police officers he saw someone come out from the Alhimidis' backyard at about 10:40 or 10:45 a.m. Luckenbach said the man walked towards the end of Skyview Street and turned northbound on the first cross street (Emerald Avenue) towards the nearby middle school. The man was wearing a dark jogging suit with the hood pulled over his head and was carrying a box similar to a donut box, and similar to the date boxes that Kassim used. Luckenbach thought the jogging suit had a side reflective stripe. Luckenbach could not see the man's face, but thought he might be in his late teens or a young adult. Luckenbach estimated the man's height to be about five feet five inches to five feet seven inches, and weighed about 150 pounds. Kassim is five feet seven inches tall and weighs about 155 to 160 pounds.

Police officers also discovered that the nearby middle school on Emerald Avenue had several surveillance video cameras. The videos of the morning of the attack (March 21) were important to the prosecution's case. The school is located on Emerald Avenue between Chase Avenue (to the North) and Skyview Street (to the South). The only outlet from the Alhimidi home on Skyview Street is Emerald Avenue near the middle school. The police (and their expert) reviewed the videos from March 21 and saw a vehicle similar to Kassim's red van (with the missing hubcap) that drove along Emerald Avenue

6

between Skyview Street and Chase Avenue at various times on the morning of March 21. These videos (and other videos from a nearby store and home) were shown to the jury.

Of particular relevance, the videos showed a vehicle left Skyview Street at 9:49 a.m. and the driver parked on Emerald Avenue near the school. The video did not clearly show the color or make of the vehicle, but an expert opined that the image likely was Kassim's van based on later tests and evaluation. The videos showed that at about 9:49 a.m., a fuzzy image of a person left the car and walked toward Skyview Street. The vehicle remained on Emerald Avenue until about 10:46 a.m. (five minutes after the attack on Shaima). At about 10:46 a.m., a fuzzy image of a person walked back to the vehicle and the vehicle was then driven on Emerald Avenue toward Chase Avenue.

About five months after Shaima's death, in August 2012, Detective Darrin Forster interviewed Kassim. Before the interview, Kassim had denied he stopped anywhere during his drive the morning of March 21. However, as detailed in the Discussion section, after being shown a "ruse" photograph, Kassim said that although he did not remember doing so, he may have pulled his car to the side during the drive to use his cell phone.

During further investigation, police officers learned that Kassim had told several individuals he had tossed tools and shoes out of his van on the day of the attack because he was afraid the police would think he had something to do with the attack. Kassim later admitted to police he had made these statements, but said he had thrown out only a hammer, and he retrieved a small hammer for the police. It was undisputed that Shaima was not killed with this hammer.

7

During additional investigation, police officers learned the Alhimidi marriage was very troubled. At trial, numerous witnesses explained that starting in about November 2011, Shaima had decided she could no longer live with Kassim, and she wanted a divorce. She was "sick and tired" of her husband and wanted to leave him. She told numerous people she could not "stand" being around him. The evidence was not entirely clear as to the reasons, but there was some evidence that Kassim was having an affair. Additionally, Shaima told others that every time she would refuse to sleep with Kassim he would refuse to give her money for herself or the kids and she was simply sick of it all.

By December 2011, Shaima stopped speaking to Kassim, unless they were arguing. About one month before the murder, Kassim began sleeping on the floor in the living room. Kassim was very upset and asked numerous people for advice. His teenage son told him to leave Shaima alone for a while. Kassim said he had already tried that. Soon after, Shaima obtained divorce papers, and told Kassim she would file for divorce. The couple got into a heated argument. Shaima's mother testified that Shaima told her Kassim said he would hire someone to kill her instead of divorcing her. The divorce papers were found in Shaima's car after the murder.

Several days before the attack, Shaima and Kassim were "arguing nonstop." On the day of the attack, the Alhimidi family had been planning to drive to Texas several days later for Shaima's brother's engagement party. Shaima's plan (of which Kassim was aware) was to stay in Texas with her two younger daughters, and Kassim would return to El Cajon with the older children. Kassim had been in touch with Shaima's sister who

8

lived in Texas, and Kassim asked that the families get together in an attempt to convince Shaima to change her mind and stay with Kassim.

On November 7, about seven months after the killing, Detective Forster conducted another very lengthy interview with Kassim. Kassim agreed to drive with police officers and show them the exact route he drove on March 21. When he did so, the drive took only about 18 minutes to reach 54th and El Cajon Boulevard, where cell phone records showed he had received the phone call from Fatima. The entire round trip took 37 minutes (as compared with the more than 90 minutes of time that was not accounted for). During this interview, the officer again asked Kassim about his relationship with his wife. Kassim admitted some relationship problems, but he minimized the extent of the problems and said they had been resolved. Kassim said he thought the divorce documents were not a real threat. He said he did not want a divorce and Shaima was going to Texas merely for a break. He said everything was fine in the 10 days leading to the attack on Shaima. The day after the interview, police arrested Kassim.

*Fatima*

The court admitted extensive evidence of Fatima's relationship with Shaima. This evidence established Fatima had a very difficult relationship with her mother. Shaima had traditional conservative Muslim lifestyle views and Fatima did not want to be bound by these traditions. Even though it is prohibited by Muslim religion/culture to date and to marry outside the Muslim faith, Fatima had a 20-year-old boyfriend (Yacub) who was a Chaldean Christian.

9

Shaima learned of this relationship at least four months before she was killed. A police officer found Yacub and Fatima in the backseat of a car possibly engaging in some form of intimate activity. Shaima begged the officer not to call her parents because she said her parents would hit her and "lock[ ] her up." But when the officer insisted, Fatima called her mother. When Shaima arrived, she was angry at Fatima. While they were driving home, Fatima opened the car door and jumped out of the car that was traveling about 30 miles per hour. Fatima had a head injury, and police officers took her to a hospital and kept her on a mental health hold for 72 hours.

Thereafter Fatima continued to secretly see Yacub. She would sometimes sneak him into the house when everyone else was asleep, and they would spend time in her bedroom. Fatima initially denied to police investigators that she was still seeing Yacub, but after they confronted her with text messages, she admitted that they continued to see each other but minimized the extent of the relationship.

At the same time of this prohibited relationship, Fatima's parents were pressuring her to marry her cousin who lived in Iraq. When the family went on a trip to Iraq from May to August 2011, Fatima had agreed to marry her cousin based on pressure from the family. She did not want to do so, but agreed on the condition that she be allowed to return to California. Fatima was concerned she would be forced to stay in Iraq if she said no. Upon the family's return to El Cajon in August 2011, Fatima told her parents she had changed her mind and did not want to marry her cousin. Fatima's decision created substantial tension within the family. However, after Fatima jumped from the car,

10

Shaima decided to take Fatima's side and was attempting to convince Kassim to allow her to get out of the marriage. Kassim was angry about this.

Notwithstanding this recent supportive position, Shaima and Fatima continued to have a difficult mother-daughter relationship. During the three years before the murder, Fatima repeatedly ran away from home, and she continued to do so after the family returned from Iraq. Shaima disapproved of Fatima's western ways, including her clothes and makeup. In response, Fatima complained about her mother "[a] lot." Fatima told her friend that she hated her mother and wished she was "dead."

Although Yacub was initially a suspect, police officers found credible his alibi that he was working a night shift the early morning hours before the attack, and then went home and slept from about 6:00 a.m. until 4:00 p.m. The prosecution presented evidence supporting this alibi at trial. Yacub testified that although he and Fatima had a close relationship, they both realized the relationship could not last because of their different religions, and he denied he had any knowledge of or played any part in the attack.

The prosecution's theory was that neither Fatima nor Yacub had anything to do with the attack on Shaima, and that Fatima's actions reflected the actions of a rebellious teenager and not someone who could or would have killed her mother or had any role in the planning of this crime.

*Defense*

Kassim did not testify, but his counsel cross-examined the prosecution witnesses showing various weaknesses in the prosecution's case. For example, defense counsel elicited evidence showing Fatima had the potential motive and opportunity to commit the

11

crime. Additionally, Fatima made various inconsistent statements shortly after she found her mother. She told the first responders that she had been sleeping during the morning of the attack, when the evidence showed she had been talking on the phone and texting. She also told her uncle that she saw a male leaving the house when she first came downstairs that morning.

Kassim also called several of his own witnesses. For example, a hospital social worker testified that after Shaima had been declared "brain dead," Kassim was "distraught" and "offered any amount of money" if the hospital could restore Shaima to health. The social worker also said that when Shaima "ultimately passed," Kassim was "crying loudly, hysterical." Kassim also called a witness to testify that Fatima had contacted an organization that provides assistance to immigrant women, and she asked for help to run away to avoid the proposed arranged marriage.

Defense counsel also called witnesses to testify about Kassim's love for his family and nonviolent nature. These witnesses said they have never seen Kassim angry and had never seen him argue with his wife. Numerous prosecution witnesses also testified that Kassim never hit his wife or children, and had never been violent or abusive towards them. The witnesses testified Kassim had a good character, was a caring father, and made positive contributions to his mosque and community.

Kassim also presented evidence that about one year after Shaima's death, Fatima (and her siblings and other family members) threw away some photographs of Shaima and other related keepsakes. At trial, Fatima said she did not know the contents of these boxes, and that it was a mistake the pictures of her mother were thrown away. However,

the evidence also showed that once these items were discovered, Fatima told police officers she did not want the items back.

*Defense Argument*

At the outset of his closing argument, defense counsel acknowledged that the attack on Shaima was "premeditated" and "vicious," but denied that Kassim had any involvement in the crime. Counsel later elaborated that given the circumstances of the attack, "[t]his was not some driven out-of-control husband who could not take it anymore. This is someone who knew what they were doing" and, in a planned manner, deliberately and methodically bludgeoned Shaima to death.

Defense counsel also emphasized the lack of fingerprints or DNA evidence; the evidence showing Kassim's gentle, polite, nonviolent nature; and the evidence reflecting that Kassim "loved his wife with every fiber of his being." Counsel acknowledged that Kassim was aware Shaima was seeking to divorce him, but argued that Kassim had no motive to kill her in response to this intent, and instead he was taking steps to reconcile with her and involve the extended family in the reconciliation. Defense counsel suggested it was more likely Kassim's daughter or her boyfriend had involvement in the crime, emphasizing the numerous inconsistencies in Fatima's testimony and the fact that Yacub could not remember the identity of his friend whose house he said he went to in the early morning hours of March 21.

*Jury Instructions, Deliberations, and Verdict*

The jury was given standard first and second degree murder instructions. (CALCRIM Nos. 520, 521.) The jury was not given manslaughter instructions. Defense

13

counsel stated he was not requesting manslaughter instructions, and the court made a determination that the evidence did not support the giving of manslaughter instructions.

During deliberations, the jury asked to see the surveillance videos of Emerald Avenue on the morning of the killing. The court presided over the video playbacks, and told the jurors to raise their hands if they wished a particular video to be repeated. The videos were then shown to the jury, and many were repeated at the jurors' requests.

Shortly after, the jury found Kassim guilty of first degree murder and found true the allegation that he personally used a deadly weapon in the commission of the killing. The court sentenced him to a term of 26 years to life in prison.

## DISCUSSION

### I. *Claimed Evidentiary Errors*

### A. *Fatima's Attorney's Immunity Request*

Kassim contends the court erred in refusing to allow him to present evidence that Fatima's attorney asked the prosecutor for immunity for Fatima shortly before she was scheduled to testify.

### 1. *Background*

Before trial, the court granted Kassim's motion to allow third-party culpability evidence, including Fatima's potential responsibility for the attack. The court noted Fatima "was present in the home at the time of the homicide. She found . . . her mother who was gravely stricken in the home, and also Fatima arguably had [a] motive to see harm done to her mother." The court stated that Fatima "is somebody who is a legitimate third party that is linked to this crime . . . [and] she is going to be subjected to some

14

unpleasant questions, I'm sure, as a . . . potential culpable third party. The law is clear on that." However, the court stated that it would consider each of the proffered items of evidence to "decide which ones are too far afield [from this third-party culpability issue] and which ones aren't."

The court then proceeded to rule on numerous items of evidence, finding that most were admissible. For example, over the prosecutor's objections, the court allowed evidence of Fatima's jumping out of her mother's car; her relationship with Yacub; her difficult relationship with her mother; her inconsistent statements made after her mother's attack; the fact that Fatima told her friends she hated her mother and wished that she was dead; and Fatima's throwing away photographs and other mementos of her mother after her mother's death. The court excluded other evidence, including evidence that one of the people Fatima spoke with on the morning of the attack was a friend who was incarcerated in a local jail[1] and evidence that Fatima created a "fake Facebook page to help . . . win Yacub's affection . . . ."

On appeal, Kassim does not challenge these in limine rulings. He instead focuses on a single ruling occurring on the fourth day of trial on the morning before Fatima was scheduled to testify. Outside the jury's presence, the prosecutor raised the issue as follows:

> "[W]hen, I met with Fatima . . . over the weekend to give her an idea of what to expect for her testimony and answer her questions, she arrived with Ron Rockwell, a man you are familiar with. He is an

---

[1] The phone call was taped. The jury heard the taped call, but did not hear evidence that the individual was in jail at the time.

15

attorney. My understanding is that she hired him at some point in the past because the media was hounding her . . . . I knew he was involved I think back as far as the preliminary hearing, but I had not heard anything since.

"Our meeting this past weekend was after our in limine motions had been heard. And in those in limine motions it became clear that the defense was at the very least going to try to insinuate that she was involved in this crime. Apparently, that made her nervous. She raised that issue with Mr. Rockwell, who arrived with her when I met with her on Saturday. . . .

"And in that, Rockwell gave me a letter that basically said he would be derelict in his duty if he didn't at least request immunity on behalf of his client. That precipitated a conversation related to the concept of immunity when it does and does not apply. And in particular, a person has to have done something that they could be criminally incriminated for during their testimony in order to have a Fifth Amendment even apply. Mr. Rockwell did not seem to quite understand that concept, and was asking for a prophylactic immunity just in case sort of thing.

"So through this conversation with Fatima in the room, the request was withdrawn."

"The Court: Withdrawn by the attorney?"

"[Prosecutor]: By the attorney. [¶] And it appeared to never actually apply."

The prosecutor then stated he gave a copy of the immunity-request letter to defense counsel and although defense counsel initially did not plan on inquiring into the issue, it appeared he was now thinking of presenting the evidence to the jury. The prosecutor asked the court exclude any reference to the evidence because it is "irrelevant" under the circumstances.

Defense counsel responded by requesting the court's permission to cross-examine Fatima about the immunity request because Fatima had been a possible suspect for "two

16

years" since her mother's death and "It strikes me now as suspicious that all of a sudden Saturday, a few days before she is supposed to testify, she goes into [the prosecutor's] office with an attorney requesting immunity. And this, again, goes to that whole third party culpability aspect of this case that we discussed in limine, in that I believe this goes to her state of mind, possibly consciousness of guilt . . . ." Counsel noted that the court must presume the attorney was speaking on his client's behalf.

After considering the arguments, the court ruled the letter and any reference to Fatima's attorney were inadmissible under Evidence Code section 352 (section 352): "The fact that she hired an attorney, the fact that the attorney may have tendered a proposed immunity letter which was rejected by the People, is not under [section] 352, the type of evidence that this court is going to allow the defense to get into."

2. *Analysis*

Generally, all relevant evidence must be admitted in criminal trials. (Evid. Code, § 351.) However, under section 352, a court may exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (§ 352; *People v. Lee* (2011) 51 Cal.4th 620, 642.) A trial court has broad discretion in determining whether evidence is relevant and, if so, whether the evidence should be excluded under section 352. A trial court's exercise of discretion will not be disturbed unless the court acted in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)

17

The court did not abuse its discretion. Although in isolation a request for immunity can be interpreted as an admission of guilt, this interpretation was not reasonable under the circumstances. It is unclear whether Fatima was aware of, or understood, the nature of the request. Additionally, there was no evidence immunity was a precondition to her testimony. Fatima was interviewed numerous times by police officers during which she answered all of their questions; she testified without limit at the preliminary hearing; and her attorney waited two years after her mother's death to raise the issue. If she had believed her testimony would suggest her involvement in the murder, it is not reasonable to conclude her attorney would have waited until the weekend before she was scheduled to testify to seek immunity. Further, Fatima's attorney (with whom the trial court was apparently familiar) acknowledged he did not appear to "understand" the immunity concept in a murder trial, and he "was asking for a prophylactic immunity just in case sort of thing."

Additionally, even assuming the immunity request had some marginal probative value, the court did not abuse its discretion in determining any relevance of the evidence was substantially outweighed by the potential for confusing and misleading the jury and the undue amount of time required to present the issue. The evidence would have required additional facts on the collateral issue of the meaning of the immunity concept in criminal law and the scope of its permitted use. The evidence would have also yielded extraneous questioning regarding Fatima's understanding of the meaning of immunity and the reason her attorney made the request. At the time, Fatima was 19 years old, unsophisticated, and not well-conversant with legal concepts. Her father was on trial for

18

her mother's murder, and it had recently become clear to this young woman that her father was going to blame her for the crime. Additionally, the immunity request (that was quickly withdrawn) would have added little to the evidence that the court had already ruled *was* admissible—that Fatima was at home at the time of the murder; she gave inconsistent statements shortly after the attack; she had previously stated she hated her mom and wished her dead; she was seeing (and possibly spending nights with) a boyfriend whom her mother had forbidden her to see; and she did not appear emotional or sad after her mother's death.

Finally, even assuming any error, the error was not prejudicial. Permitting questioning on the immunity request would have led to the admission of the attorney's quick withdrawal of the request and the fact that Fatima did not object to the withdrawal. The prosecutor would have also been permitted to present evidence regarding the basis for that withdrawal—the prosecutor's assurance that Fatima had no need for immunity because her testimony could not possibly have a tendency to incriminate her. This latter evidence would have been more damaging to Kassim than any possible benefit from evidence of the request. On this record, it is not reasonably probable that a more favorable result would have occurred had the evidence been admitted. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Further, contrary to Kassim's arguments, the exclusion of Fatima's attorney's immunity request did not deprive Kassim of a fair trial or a right to present his defenses. Thus, a more stringent prejudicial error analysis is not required. But even under the federal constitutional error analysis, the court's ruling was not prejudicial.

19

B. *Kassim's Prearrest Statements About Parking His Car on Emerald Avenue*

Kassim contends the court erred in denying his motion to suppress his statements about parking his car on Emerald Avenue near his home at the time of the murder.

### 1. *Motion Before Trial*

During motions in limine, Kassim moved to exclude statements he made during the August 2012 and November 2012 police interviews concerning the fact that he parked (or may have parked) his vehicle on Emerald Avenue around the corner from his home during the time of the attack. These statements contradicted his earlier statements that he never stopped his car after he left the house at about 9:40 a.m. until he came home shortly after receiving the 11:17 a.m. call from Fatima.

In response to Kassim's motion, the court held an Evidence Code section 402 hearing. At this hearing, Detective Forster testified that the school surveillance videos showed a car similar to Kassim's red van being parked on Emerald Avenue (around the corner from Kassim's home) in the morning of the attack on Shaima. However, these videos were blurry and did not clearly show this was Kassim's vehicle. In an attempt to obtain clarification, law enforcement officers took the van out of impound and parked it where it appeared on the video to have been parked. A police officer then took a photograph of the car, and placed a March 21 date stamp on that photograph. In an August 10 interview, the police officer showed Kassim this photograph for the purpose of using a "ruse" to "see if [Kassim] would admit to parking on Emerald [Avenue]." Kassim initially responded he did not park there. Later in the interview, he said he did

20

not remember parking there, but he could have possibly pulled over to use a phone on the side of the street.

At the conclusion of this testimony, the court asked whether it was the People's "intent to present evidence of any alleged admissions by [Kassim] that he parked on Emerald on the day of the homicide?" The prosecutor answered "No." The prosecutor noted that in the subsequent November 2012 interview (held the day before Kassim was arrested), law enforcement officers again referred to the ruse photograph, and at that point, Kassim admitted he was now certain he did park on Emerald Avenue, but that he does not remember why he did that. The prosecutor stated he would "agree not to use th[is] portion of [the November] interview . . . ."

Based on the prosecutor's statements, the court deferred ruling on the motion. The court said that although it might be willing to admit portions of the challenged evidence because "ruse interviews are often conducted," the People resolved the problem by agreeing not to present the evidence. The court noted that if the issue should arise again during trial it would then rule on Kassim's exclusion motion.

### 2. *Altered Photograph Evidence During Trial*

During Detective Forster's trial testimony, the parties had a conference outside the jury's presence during which the prosecutor indicated he was now thinking of presenting evidence of Kassim's response to the ruse photograph (to refute certain statements made by defense counsel during opening statements). After lengthy arguments by counsel, the court ultimately concluded that evidence of Kassim's statements both during the August interview and the November interview were admissible.

During his direct testimony before the jury, Detective Forster then described the fact that officers created the ruse photograph with the March 21 date, and showed the photograph to Kassim during the August 2012 interview, falsely telling him that the photograph was gleaned from enlarging the videotape images. Detective Forster testified that Kassim's "first reaction" to the photograph was to say " 'impossible' " and the photograph could not be his vehicle. Detective Forster said the officers "did not press him very hard" on this issue, but later in the interview, Kassim volunteered that "he does not remember and maybe he pulled over to use the phone."

The prosecutor also questioned Detective Forster about his November 2012 interview with Kassim. Detective Forster testified that during this interview, the law enforcement officers asked whether Kassim would ride in his vehicle and ask him to point out the exact route that he took the morning of his wife's attack. Kassim agreed to do so. When the prosecutor asked Detective Forster whether he asked Kassim during the drive whether he stopped anywhere along the way, Detective Forster responded: "I did. [¶] He originally told me he made no stops, and that on the way back, he says he can't remember. Sometimes he will stop to use the phone and pull over, but he did not go anywhere and he did not make any stops when he returned home."

During cross-examination, defense counsel asked whether Detective Forster decided to arrest him the next day "because he is now saying he parked on Emerald; correct?" Detective Forster responded: "No. Because now he knows he's the focal point of our investigation, and we decided to arrest him." Defense counsel also asked a series

22

of questions about the creation of the altered photograph, and elicited Detective Forster's testimony that Kassim repeatedly said " 'impossible.' "

### 3. *Analysis*

Kassim contends the court erred in permitting Detective Forster to testify about his reactions to the ruse photograph because these statements were involuntarily coerced.

The due process clause bars the admission of involuntary statements obtained when coercive police tactics overbear the suspect's will. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.) In evaluating voluntariness, courts look to the totality of the circumstances and ask whether the confession is the product of " ' "rational intellect and a free will." ' " (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1401, quoting *Lynumn v. Illinois* (1963) 372 U.S. 528, 534.) A statement induced by threats is involuntary, but " '[p]olice trickery . . . does not, by itself, render a confession involuntary.' " (*People v. Mays* (2009) 174 Cal.App.4th 156, 164; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 ["Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary."].) A statement following a police ruse is involuntary if there is "a proximate causal connection between the deception or subterfuge and the confession." (*Musselwhite*, at p. 1240, italics omitted.) Psychological ploys are coercive only if, under all the circumstances, they tend to produce a statement that is both involuntary and unreliable. (*People v. Smith* (2007) 40 Cal.4th 483, 501.)

In this case, we need not determine whether the ruse photograph had the potential to be coercive, because the prosecutor did not present evidence that Kassim made a

23

confession or an inculpatory statement or admission based on the photograph. Before Kassim was shown the altered photograph, he stated that he did not park on Emerald Avenue. During the August 2012 interview he was shown the photograph depicting his car parked in front of the school on that date. Kassim immediately responded that it was " 'impossible.' " Later in the same interview, he stated he did not recall parking on Emerald Avenue, but he may have stopped to take a phone call during his drive. Although Kassim later made strong inculpatory statements during the November interview that he now remembered parking on Emerald Avenue, the jury never heard those statements. Because the parties did not present evidence at trial that Kassim made incriminating statements, there was no error.

Moreover, any possible error in admitting Kassim's statements after he was shown the false photograph was harmless beyond a reasonable doubt. His August 2012 statements about possibly stopping to take a phone call were brief, minimal, and not inculpatory, and they did not reflect an admission that he parked *on Emerald Avenue*. The actual surveillance video showing a vehicle resembling Kassim's van parked on Emerald Avenue (around the corner from Kassim's house) from 9:49 a.m. to 10:46 a.m. was strong evidence that he parked on this street and went back to his house to kill his wife. Kassim's statements that he may have pulled over to make a phone call during his drive contributed little, if anything, to the evidence supporting his guilt. The jury requested to watch the videos during deliberations. They were shown the videos, and several jurors asked for these videos to be repeated several times. It was the videos—and

24

not Kassim's reaction to a false still photograph—that likely impacted the jury's decisionmaking.

### III. *Asserted Instructional Errors*

### A. *Background*

The court instructed the jury on the elements of first and second degree murder using the standard CALCRIM form instructions.  (CALCRIM Nos. 520, 521.)[2]  These

---

2      Under CALCRIM No. 520, the court instructed the jury in relevant part as follows:  "To prove that the defendant is guilty of the crime of murder, the People must prove two things:  No. 1, the defendant committed an act that caused the death of another person; and No. 2, when the defendant acted, he had a state of mind called malice aforethought.  [¶] There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.  [¶]  The defendant acted with express malice if he unlawfully intended to kill.  [¶]  The defendant acted with implied malice if he intentionally committed an act, and the natural and probable consequences of the act were dangerous to human life, and at the time he acted, he knew his act was dangerous to human life and he deliberately acted with conscious disregard for human life.  [¶]  Malice aforethought does not require ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberations or the passage of any particular period of time.  [¶] . . . [¶]  If you decide the defendant committed murder, it is murder of the second degree unless the people have proved beyond a reasonable doubt that it is murder of the first degree, as defined in CALCRIM No. 521, first degree murder, which I will give you now."

Under CALCRIM No. 521, the court instructed the jury as follows:  "The defendant is guilty of first degree murder if the People have proved he acted willfully, deliberately and with premeditation.  [¶]  The defendant acted willfully if he intended to kill.  [¶]  The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill.  [¶]  The defendant acted with premeditation if he decided to kill before completing the acts that caused death.  [¶]  The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  The amount of time required for premeditation may vary from person to person and according to the circumstances.  [¶]  A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection and

instructions stated that to establish first or second degree murder, the prosecution was required to prove beyond a reasonable doubt that Kassim committed "an act that caused the death of another person," *and* that act was committed with express malice (intent to kill) *or* implied malice (conscious disregard for life). (See CALCRIM No. 520.) On first degree murder, the court instructed the jury that the People must additionally prove the defendant "acted willfully, deliberately, and with premeditation," and explained the meaning of these terms, including that "[a] decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." (See CALCRIM No. 521.) This instruction further stated: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." (See CALCRIM No. 521.)

The court did not instruct the jury on manslaughter or give the CALCRIM No. 522 pinpoint instruction that provocation can reduce a first degree murder to second degree. During the jury instruction conference, the court stated it had considered whether a voluntary or involuntary manslaughter instruction should be given under any possible interpretation of the evidence, and concluded "[t]here is no evidence to support giving of either one." Defense counsel responded that he was not asking for a manslaughter

---

not the length of time. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder, and the murder is second degree murder."

26

instruction, and did not object to the court's determination, and "appreciat[ed]" the court's determination.

### B. *Appellate Contentions*

On appeal, Kassim does not challenge the court's decision not to give manslaughter instructions. But in three separately labeled contentions, Kassim contends the court inadequately instructed the jury on "provocation-based" second degree murder. Kassim contends the court sua sponte should have given additional instructions on the subjective form of provocation.

In considering these contentions, we are guided by well-settled principles. A trial court has a duty to instruct sua sponte on the general principles of law relevant to the issues raised by the evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 866 (*Rogers*).) We independently review the correctness and adequacy of the trial court's instructions, examining whether the court " 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) We consider the instructions as a whole and presume the jurors are capable of understanding and correlating the instructions. (*Ibid.*)

A trial court has a duty to adequately instruct on the law, but "it has no duty to give clarifying or amplifying instructions, absent a request." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331 (*Hernandez*).) Pinpoint instructions—instructions that relate particular facts to a legal issue in the case—are required to be given on request if there is evidence to support the theory, but are not required to be given sua sponte.

27

(*People v. Saille* (1991) 54 Cal.3d 1103, 1119; *People v. Hill* (2015) 236 Cal.App.4th 1100, 1118-1119.)

### 1. *Failure to Instruct on CALCRIM No. 522*

Kassim first contends the court erred in failing to sua sponte instruct on CALCRIM No. 522 that provocation can reduce a first degree murder to second degree murder. As relevant here, CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree . . . . The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

This instruction is based on the principle that " 'provocation which is not "adequate" to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation.' [Citations.]" (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, overruled on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.) The California Supreme Court has held that an instruction under these principles on provocation for second degree murder is a pinpoint instruction that need not be given sua sponte by the trial court. (*People v. Rogers, supra*, 39 Cal.4th at p.

28

878; accord *People v. Mayfield* (1997) 14 Cal.4th 668, 778; *Hernandez, supra*, 183 Cal.App.4th at p. 1333.)

Kassim argues *Rogers* is distinguishable because in that case a manslaughter-provocation instruction was given. This is a distinction without a difference on the sua sponte duty issue. In *Rogers*, the high court agreed with the Attorney General that the predecessor instruction to CALCRIM No. 522 (CALJIC No. 8.73) was a pinpoint instruction because the provocation at issue "is relevant only to the extent it 'bears on the question' whether defendant premeditated and deliberated. [Citation.] Because [the instruction] relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' . . . and need not be given on the court's own motion." (*Rogers, supra*, 39 Cal.4th at p. 878.)

That reasoning applies equally to CALCRIM No. 522. The fact that provocation may reduce a murder from first degree to second degree is relevant only to the extent it " 'bears on the question' whether [the] defendant premeditated and deliberated." (*Rogers, supra*, 39 Cal.4th at p. 878.) In other words, if a killing was the sole result of a defendant emotionally reacting to an incident, this may be evidence that the defendant did not subjectively form the necessary premeditation and deliberation necessary for first degree murder. This is a pinpoint instruction that should be given on request when the evidence supports it, but need not be given sua sponte. (See *Hernandez, supra*, 183 Cal.App.4th at p. 1333.)

Kassim contends this case is distinguishable from *Rogers* because in that case, the trial court instructed the jury with the former first degree murder instruction (CALJIC

No. 8.20), which included a statement that to be a first degree murder, the killing must not have occurred "under a sudden heat of passion or other condition precluding the idea of deliberation . . . ." However, in this respect, CALJIC No. 8.20 is no different from CALCRIM No. 521. Under the current first degree murder instruction given here (CALCRIM No. 521), the jury was specifically told that "A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." This statement is in substance the same as the statement in CALJIC No. 8.20 that a killing under a "heat of passion . . . preclude[s] the idea of deliberation." (See *Hernandez, supra*, 183 Cal.App.4th at pp. 1333-1334.)

We also reject Kassim's argument the *Rogers* court "qualified its holding" only to circumstances where there was no evidence of provocation that would negate first degree murder to manslaughter. There is nothing in *Rogers* supporting this interpretation, and the proposed interpretation is inconsistent with settled law. There is no duty to give a pinpoint instruction if there is no evidence to support the instruction. (See *People v. Ervin* (2000) 22 Cal.4th 48, 91.) Accordingly, the *Rogers* court's holding—that a sua sponte instruction is not required on the pinpoint concept of provocation relevant to reducing first degree murder to second degree murder—necessarily encompassed the circumstances when there is allegedly evidence supporting provocation. Because CALCRIM No. 521 fully and completely instructs on the concept of first degree premeditated murder, there is no need for a pinpoint instruction on provocation (CALCRIM No. 522) unless there is evidence to support it *and* it is requested by counsel. (See *Rogers, supra*, 39 Cal.4th at pp. 877-880.)

30

Kassim's reliance on *People v. Valentine* (1946) 28 Cal.2d 121 is misplaced. In

*Valentine*, the court failed to instruct the jury on the effect of provocation and passion as

"precluding or making doubtful the formation of a deliberate and premeditated intent to

kill," *and* improperly instructed the jury that if the killing was committed as a result of an

intent to kill it is " '*of course . . . murder of the first degree*.' " (*Id.* at p. 131.) The

California Supreme Court found this latter instruction "completely eliminated the

statutory difference between murder of the first degree and murder of the second degree

and required the jury, if they found the homicide to be murder at all, to find it to be

murder of the first degree." (*Ibid.*) The instructions here were not similarly flawed.

Unlike in *Valentine,* the jury was specifically and correctly instructed on the difference

between first and second degree murder (deliberation and premeditation). The fact the

jury in this case was not given an additional pinpoint instruction on provocation did not

"eliminate[ ] the difference" between first and second degree murder, or require the jury

to find first degree murder as in *Valentine*.

Finally, even assuming there was a sua sponte duty to instruct on CALCRIM No.

522, the court did not err in failing to instruct on this concept because there was

insufficient evidence in the record supporting this theory.

There was no evidence on which a reasonable jury could find Kassim's actions

were in response to any provocation or that his reasoning and judgment were obscured by

intense emotion. Consistent with the defense theory at trial, the evidence showed that

whoever committed this murder, planned the murder in advance and committed it with

deliberation and premeditation. The evidence showed planning activity (the preparation

31

and leaving of the photocopied note), and an exacting manner of death (six blows to the head while Shaima was on the floor and with an absence of substantial defensive wounds). The undisputed evidence further showed that Kassim never claimed he was wrought by intense emotion on the day of the killing. He said everything was fine, and they had no problems other than ordinary, everyday concerns, and that he was not bothered by Shaima's desire to divorce him, because he did not view that request as real and intended to deal with that problem with the extended family's help when the family went to Texas several days later.

Kassim's appellate counsel relies on evidence that Fatima told first responders that she heard an argument that morning. However, there is nothing about this evidence that shows Kassim acted immediately in the heat of passion or in response to provocation or that his reasoning was clouded by emotion. There was no evidence Kassim had been previously physically abusive toward Shaima or his children, or had used physical force against his wife or children or anyone else. Fatima described hearing only one voice (her mother's) and there is no evidence that Kassim raised his voice or yelled at Shaima. There are no facts reflecting a heated, passionate argument that could have negated a finding of premeditation and deliberation.

These circumstances are different from the fights and arguments in the cases relied upon by Kassim. (See, e.g., *People v. Valentine, supra*, 28 Cal.2d 121.) Under the particular circumstances here, the evidence did not support a pinpoint instruction on provocation relevant to reducing first degree murder to manslaughter. (See *People v.*

*Johnson* (1993) 6 Cal.4th 1, 43; see also *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705-1706.)

    2. *Jury Was Properly Instructed on Express Malice Second Degree Murder*

Kassim next contends the court erred in failing to instruct the jury that he could be found guilty of second degree murder even if he killed with express malice.  The argument is without merit because the jury was properly instructed on the applicable concepts.

As discussed above, the court instructed the jury that to prove murder, the prosecution must prove express *or* implied malice, and defined each of these concepts. (See *ante*, fn. 2.)  The court then instructed "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521." CALCRIM No. 521 (given to the jury) states:  "defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation," and defines these concepts.

These instructions make clear that a murder with express malice is second degree murder unless the prosecution meets its burden to show deliberation and premeditation defined in CALCRIM No. 521.  A reasonable jury would not have understood it could find the prosecution met its burden to establish first degree murder merely because it found Kassim killed with express malice.

In support of this argument, Kassim relies on a different portion of *Rogers, supra*, 39 Cal.4th 826, in which the court found the trial court erred in failing to instruct the jury

33

on the definition of second degree murder committed with express malice. (*Id.* at pp. 866-867.) Using predecessor CALJIC instructions, the trial court in *Rogers* instructed the jury that a second degree murder can result from an intentional act " 'involving a high degree of probability that it will result in death . . . and who acts with a conscious disregard for human life' " (i.e., implied malice), but the *Rogers* trial court did not *also* instruct the jury that a second degree murder can "also occur[ ]" when there is a manifested intent to kill the victim (express malice). (*Id.* at p. 866.) Under these instructions, the court found the jury could have improperly believed that a murder with express malice is sufficient for first degree murder even without deliberation and premeditation. (*Id.* at pp. 866-867.)

This error did not occur here because the jury *was* instructed that murder with express malice—defined as unlawful intent to kill—but without premeditation and deliberation was second degree murder only. There is no reasonable likelihood that the jury would have understood the CALCRIM murder instructions require first degree murder if Kassim had acted with express malice but without deliberation or premeditation.

Further, as explained above, any possible error was harmless. There is no likelihood the jury would have returned a finding of second degree murder under the facts presented if it had been given additional instructions that a murder with express malice but without deliberation and premeditation is second degree (and not first degree) murder. As defense counsel conceded at closing argument, the undisputed facts showed the killing was committed with premeditation and deliberation.

34

3. *Jury Properly Instructed on Subjective Premeditation and Deliberation Standard*

Kassim additionally contends the court erred in failing to instruct the jury that the prosecution had the burden of proving the absence of provocation and/or heat of passion ("measured by a 'subjective' standard") that rendered him unable to deliberate and premeditate. For the reasons discussed above, we reject this contention. As explained, the jury was fully instructed on the meaning of deliberation and premeditation in CALCRIM No. 521, and that the prosecutor had the burden of proving these elements.

Defendant argues the jury "was never instructed on the basic, well-settled principle of homicide law that provocation that would not cause a reasonable person to act in the heat of passion may still reduce the offense from first to second degree murder if the defendant was subjectively in a heat of passion at the time of the killing." We disagree. The jury was adequately instructed on the concept in the CALCRIM No. 521 instruction. (See *ante*, fn. 2.) The jury was told that a person who acts "rashly, impulsively or without careful consideration" does not act with deliberation or premeditation. This instruction conveys that actions under a heat of passion may reduce first degree murder to second degree murder if they negate the defendant's ability to premeditate and deliberate. The fact the model instruction does not specifically include the words "heat of passion" or "subjectively," and instead refers to acts "made rashly, impulsively, or without careful consideration," does not suggest the jury was not properly instructed on the applicable principles.

To the extent Kassim suggests the jury may have been confused by the concepts of unreasonable and reasonable provocation, the argument is without merit on the record

35

before us.  Because the jury was not instructed on voluntary manslaughter, it was never given an "objectively reasonable" provocation instruction.  Thus, there is no grounds for finding the jury would have been confused and could not have properly distinguished these concepts.

Finally, as discussed above, the evidence did not support the existence of subjective provocation or heat of passion.  The undisputed evidence established that the murder was deliberate and premeditated, and there was no evidence supporting a subjective heat of passion theory.

DISPOSITION

Judgment affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

36